UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**CASE NO: 0:19-CV-61603-WPD**

LAUREEN HAVEL-GOLDFARB,
Plaintiff,

Vs.

SAFE N STEADY, INC.,
JAMES D. GOLDBERG, &
CATHI B. GOLDBERG,
Defendants.

_____/

### DEFENDANTS' REPLY TO THE PLAINTIFF'S RESPONSE TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT WITH INCORPORATED MEMORANDUM OF LAW

The Defendants collectively in accordance with Fed. R. Civ. P. 56, and Local Rule 56.1(a), S. D. Fla. hereby file this their Reply to the Plaintiff's Response to the Defendants' Motion for Summary Judgment. [ECF-32]  For the reasons stated below, the Defendants request that their Motion for Summary Judgment be granted.

### INTRODUCTION

The issue before the Court is whether the Plaintiff as a Registered Home Health Aide/Caregiver[1] who was registered with the Defendant Safe N Steady, Inc. ("Safe N Steady"), a Florida licensed Nurse Registry, is an employee as the Plaintiff claims or an Independent Contractor as mandated by Florida Law?

### REPLY TO RESPONSE

---

[1] "Caregiver" is defined in Fla. Administrative Code, 59A-18.002 (3) as "Caregiver" means a registered nurse, licensed practical nurse, certified nursing assistant, home health aide, homemaker or companion that is referred by a nurse registry to provide services to patients.

1

## I. Florida law required that the Plaintiff be an Independent Contractor

There is no dispute as the Plaintiff acknowledged that: (i) Safe N Steady is a duly Florida licensed Nurse Registry; (ii) the Plaintiff is a statutorily defined Caregiver, which includes the Plaintiff as a Home Health Aide; (iii) that all Home Health Aides that have a relationship with the Defendant must be Independent Contractors; and (iv) the Defendants would be in violation of the law if the Plaintiff was treated as an employee and not an Independent Contractor.[2]

The purpose of a Nurse Registry is the referral of Caregivers who register with them to provide health care related services to clients who request to engage the Caregiver's services once the Nurse Registry faciliates the introduction.[3] As all Caregivers of the Defendants must be Independent Contractors, the Defendants' Motion for Summary Judgement must be granted.

## II. Independent Contractor Agreement is Probative of the Intent of the Parties.

The Plaintiff relies on out of date "Employee Contract" that was mistakenly presented to her in the registration package in support of her belief that she was an employee.[4] However, the Plaintiff contemporaneously executed an "Independent Contractor Contract." (Exhibit A) which

---

[2] Defendants' Reply to Response to Statement of Facts ¶¶3, 4, 5, 7, 9, 12, 13, 14; Plaintiff's Response to Defendants' Statement of Material Facts, ECF-31, ¶¶3, 4, 5, 7, 9, 12, 13, 14; Defendants' SOMF ECF-28, ¶¶3, 4, 5, 7, 9, 12, 13, 14.

[3] F.A.C. 59A-18.002(10) "Nurse registry services" means referral of independent contractors to provide health care related services to a patient or client in the person's home or place of residence or through staffing in a health care facility by an independent contractor referred through a nurse registry. Such services shall be limited to: (a) Nursing care provided by licensed registered nurses or licensed practical nurses, or (b) Care and services provided by certified nursing assistants or home health aides, or (c) Homemaker or companion services.

[4] 2d Aff. George Oritis, ¶¶2, 3; Defendants' Reply to Response to Statement of Facts ¶19.

detailed the correct duties and relationship of the Plaintiff.  At no time was the Plaintiff ever held to the terms of the Employment Agreement.[5]

The label of "independent contractor" though not controlling it is clearly probative of the parties' intent of their relationship and is a relevant factor for consideration by the court.[6]  The Independent Contractor Agreement supports the true intent of the parties which is in full compliance with statutory obligations of the Plaintiff and Defendant in this Independent Contractor relationship.

### III.  The Economic Realities Test proves that the Plaintiff was an Independent Contractor.

Six (6) factors guide the Economic Realities Test, *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013) namely: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon her managerial skill; (3) the alleged employee's investment in equipment or materials required for her task; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business. Id. at 1311-12. The overarching <u>focus of the test is economic dependence,</u> or in other words, <u>whether the Plaintiff is "in business for himself" or is "dependent upon finding employment in the business of others.</u>" Id. at 1312; *Freund v. Hi-Tech Satellite, Inc.*, 185 Fed. Appx. 782, 782 (11th Cir. 2006).  These six (6) factors are used because they are "indicators of economic dependence,"

---

[5] *Id.*

[6] *See Daughtrey, v. Honeywell, Inc.*,  3 F.3d 1488, 1492, (11th Cir.1993) (finding the parties' intent probative, but not decisive). *Ashkenazi v. S. Broward Hosp. Dist*. No. 13-15061 (11th Cir. April 23, 2015)(D.C. Docket No. 0:11-cv-61403-JIC.)

the weight of each factor depends on the light it sheds on the Plaintiff's dependence (or lack thereof) on the Defendant, which depends on the specific facts of the case.[7]

The Defendants unequivocally demonstrate that when the "Economic Realities Test," is applied to the facts of this case, the Court must find that the relationship between the Plaintiff and the Defendants is that of an Independent Contractor, as the Plaintiff is clearly in business for herself and not economically dependent on the Defendants.[8]

**First Factor**: *The nature and degree of the alleged employer's control as to the manner the work is to be performed ("Control Factor").* The Defendants have no control as to the manner in which the care is provided to the clients. Once a Caregiver registers with the Defendant, they learn the needs, wants and affordability of the clients and the needs and requirements of the Caregiver, and an introduction is then made. If the Caregiver and the client want to engage in a relationship, they negotiate the terms and conditions themselves and report the results to the Defendants.[9] In the case at bar, all decisions and oversight of the Plaintiff in providing services to the client was performed by Sol Pearlman, the client's son, as he was the client's healthcare surrogate and attorney-in-fact. (Exhibit B) The terms, conditions, and rate of pay for the Plaintiff's services was negotiated between Sol Pearlman and the Plaintiff.[10]

---

[7] *Antenor v. D&S Farms, 88 F.3d 925*, 931-32 (citing *Aimable*, 20 F.3d at 439-40), as cited in *Batten v. Barfield*, Case No: 5:18-cv-483-OC-PRL, M.D. of Fla. (Nov. 26, 2019).

[8] *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013); *Freund v. Hi-Tech Satellite, Inc.*, 185 Fed. Appx. 782, 782 (11th Cir. 2006).-

[9] Aff. James D. Goldberg, ¶17(C); Aff Cathi B. Goldberg, ¶17(C); Aff. George Oritis, ¶17(C); SOMF ECF-28, ¶18; Plaintiff's Response to SOMF, ECF-31.¶18; 2d Aff. Cathi Goldberg, ¶4, 6; Aff. Sol Pearlman, ¶5, 8.

[10] Aff. Sol Pearlman, ¶2, 8, 10, 13; 2d Aff. Cathi Goldberg, , ¶¶2, 5, 6.

The Plaintiff sought to create the illusion that since Defendant Cathi Goldberg and Jimmie Goldberg were the daughter and son-in-law of the client that they were directing the care for the client. Not only is this a divisive misstatement, but if the Defendants were in control of the Plaintiff's caregiving services, the Plaintiff would have been terminated. None of the Defendants would have tolerated that the Plaintiff drank alcoholic beverages while working, entertained her family members at the client's home, sold handbags to third parties from the client's house; routinely picked-up her grandchildren, marketed her singing career, and had her hair colored by third parties at the client's home. Since Sol Pearlman approved the Plaintiff's self-initiated care, the Defendants had no authority to intervene, regardless how repugnant the conduct was to them.[11]

In further support of the control that the Plaintiff exercised, the Plaintiff on her own initiative, authored a notebook wherein Plaintiff detailed her duties and routines that she initiated for the client. The Plaintiff's notebook delineated: (i) the client's daily routine; (ii) the duties that she performed for the client and the duties that the Plaintiff required any Caregiver who covered for her in her absence to follow; (iii) the social schedule that the Plaintiff put in place; the food and beverages that client ate and drank at the specifically named restaurants and clubs that the Plaintiff took the client to. Pertinent pages from the Notebook are attached hereto as Exhibit C. These activities were approved by Sol Pearlman and not the Defendants. This notebook was used in part to manage the care that fill-in Caregivers/Home Healthcare Aides were to provide to the client in the Plaintiff's absence. This notebook exemplifies the command and control that the Plaintiff

---

[11] 2d Aff. Cathi Goldberg, ¶9; Aff. Sol Pearlman, ¶13.

exercised in her management of client's care.  Attach as <u>Exhibit D</u> is a text message that the Plaintiff sent to another Caregiver of the client.[12]

In keeping with the rationale in *Scantland*, this Court must find that the Plaintiff was an Independent Contractor.  The *Scantland* Court found the Plaintiff was an employee because the <u>Defendant controlled</u> all aspects of the Plaintiff's pay, scheduling, ability to work for others, and whether they could earn extra income.[13]  Here all of these delineated aspects of the parties relationship are controlled by the Plaintiff, not the Defendants.  The rationale in *Scantland* requires that this Court find that the Plaintiff was not economically dependent on the Defendants and as such the Plaintiff was an Independent Contractor.

**Second Factor**: *The alleged employee's opportunity for profit or loss depending upon her managerial skill ("Opportunity for Profit or Loss Factor")*.  In *Scantland*, 721 F.3d 1317, the Court noted that where the Plaintiffs were <u>limited</u> by the Defendants in using their own initiative to advance themselves it was indicative that they were employees of the Defendants.  Despite the Plaintiff's false representation that she was limited and at the mercy of the Defendants for economic advancement and dependency, the facts show that the Plaintiff contemporaneously while working for the client was: (i) a "Lyft" driver; (ii) a "DJ - Karaoke Host, - Singer;" and (iii) a licensed realtor.[14]

In addition to the fees structure that the Plaintiff and Sol Pearlman negotiated and which was paid for through the Defendant Registry, the Plaintiff negotiated for Sol Perlman to also pay for the Plaintiff's gas, tires, weekly car washes, and all of the expenses for the Plaintiff and the

---

[12] 2d Aff. Cathi Goldberg, ¶2; Aff. Sol Pearlman, ¶16.

[13] *Scantland*, 721 F 3d 1308, 1311.

client on all of their outings, as additional unreported compensation.[15]  Applying, the holding in *Scantland*, the Plaintiff was an Independent Contractor.

**Third Factor**: *The alleged employee's investment in equipment or materials required for his task, or his employment of workers ("Investment in Equipment or Materials") Scantland,* 721 F.3d at 1311.  Despite the Plaintiff's claim that she only provided gloves the Plaintiff actually provided two (2) walkers, a wheelchair, and a foot wedge for the client's use.[16]  There was no economic dependence on the Defendant to supply equipment for the Plaintiff to perform her duties, as the Plaintiff shouldered this responsibility.  In keeping with *Scantland*, this favors a finding of the Plaintiff being an Independent Contractor.  *Scantland*, 721 F. 3d, 1308, 1318.

**Fourth Factor**: *Whether the service rendered requires a special skill ("Special Skill").* The Plaintiff was required by law to have certain training to become a certified Home Health Aide and to maintain her certification, all at her own expense.[17]  The fact that special skills are required of the Plaintiff and that the Defendants as a Nurse Registry are not obligated to monitor, manage, train, or supervise the Plaintiff,[18] supports that the Plaintiff is an Independent Contractor. *Scantland*, 721 F.3d 1318.

**Fifth Factor**: *The degree of permanency and duration of the working relationship ("Permanency and Duration")*  In *Scantland*, 721 F.3d 1317-1318, the Court noted that where

---

[14] 2d Aff. Cathi Goldberg, ¶7; Aff. Sol Pearlman, ¶12.

[15] 2d Aff. Cathi Goldberg, ¶6; Aff. Sol Pearlman, ¶7.

[16] Aff. Sol Pearlman, ¶15; 2d Aff. Cathi Goldberg, ¶10.

[17] Fla. Stat. §400.462(15).  A Home Health Aide is trained or qualified, as provided by rule, and who provides hands-on personal care, performs simple procedures as an extension of therapy or nursing services, assists in ambulation or exercises, or assists in administering medications as permitted in rule and for which the person has received training established by the agency under s. 400.497(1)."

the Plaintiff <u>is limited by the Defendants</u> in using their own initiative to advance themselves, it was indicative that they were employees of the Defendants.   The Defendant here places no restrictions on the Plaintiff.   Once a Caregiver registers with the Defendants, so long as the Caregiver remains legally compliant, the Caregiver will remain on the Defendants' registry, if they so desire, even if the client terminates the relationship or the client dies (which frequently occurs).[19] Because of the transient nature of the work many Caregivers are registered with several registries and/or have other business interests.   The Plaintiff here was also a Lyft driver, a DJ-Karaoke entertainer, and Realtor.[20]   In this action, the Plaintiff's economic growth, permanency and duration was clearly in her own hands and not that of the Defendants.   Accordingly, this factor further supports that the Plaintiff was an Independent Contractor.[21]

**Sixth Factor**: *The extent to which the service rendered is an integral part of the alleged employer's business ("Integral Part of Alleged Employer's Business")*.   The Defendants business is that of a Nurse Registry, not providing care for patients.   The purpose of a Nurse Registry[22] is the referral of Independent Contractor Caregivers who registered with them to provide health care related services to clients who request to engage the Caregiver's services once the Nurse

---

[18] Fla. Stat. §400.506(19); F.A.C. 59A-18.0081(15).

[19] 2d Aff. Cathi Goldberg, ¶12.

[20] 2d Aff. Cathi Goldberg, ¶6; Aff. Sol Pearlman, ¶7

[21] *Scantland*, 721 F.3d 1318. (Held that when the plaintiffs were required to work long hours, could not work for other companies, and could not turn down work assigned to them by their employer, and in essence was in an exclusive relationship, the plaintiff was an employee.)

[22] F.A.C. 59A-18.002(10) "Nurse registry services" means referral of independent contractors to provide health care related services to a patient or client in the person's home or place of residence or through staffing in a health care facility by an independent contractor referred through a nurse registry. Such services shall be limited to: (a) Nursing care provided by licensed registered nurses or licensed practical nurses, or (b) Care and services provided by certified nursing assistants or home health aides, or (c) Homemaker or companion services.

Registry faciliates the introduction.   In *Scantland*, 721 F.3d 1317-1318, the Court noted that if the Defendants had outsourced a large portion of its business then the Plaintiff were Independent Contractors. *Id*.  This is the exact business model of the Defendants.  As such, in keeping with the holding in *Scantland*, the Plaintiff is an Independent Contractor.

When applied to the case at bar the Economic Realities test clearly establishes that the Plaintiff was not economically dependent upon the Defendants as the Plaintiff was clearly in business for herself. *Id*.  As such, the Plaintiff was an Independent Contractor and not an employee of the Defendants.

## IV.  *Tondro v. At Home Senior Care of Broward, No. 16-60001-Civ-Cohn* **is not controlling.**

The Plaintiff relies on Judge Cohn's "Findings of Fact and Conclusions of Law," in *Tondro v. At Home Senior Care of Broward,* Case No. 16-60001-Civ-Cohn, ECF-63 (Aug. 10, 2016).  However, *Tondro* is factually distinguishable from the case at bar, in that unlike in *Tondro*, here: (i) the Plaintiff controlled her rate of pay and her schedule (ii) capitalized her earning potential by negotiating additional compensation well above what she negotiated and was paid through the registry; (iii) made significant investments in tools and equipment by providing walkers and wheelchairs; (iv) was skilled as she was required to be certified in CPR, bloodborne pathogens, HIV, and transferring skills; (v) the Plaintiff in addition to being a Caregiver, she was a Lyft driver, a DJ Karaoke entertainer, and licensed realtor – her earning opportunities were not exclusive to the Defendants and she was in full control of her permanency and dependency; and (vi) the Defendant was in the business of assisting in the placement of Independent Contractor Caregivers like the Plaintiff.

When the Court applies the Economic Realities Test to these clearly distinguishable facts

of the present action along with holdings and rationale in *Scantland*, this Court will find that this case is distinguishable from Tondro and find that the Plaintiff was an Independent Contractor.

## CONCLUSION

While the Defendants presented five (5) affidavits from three (3) persons and significant documentary evidence to support the undisputed material facts that require the granting of the Defendants' Motion for Summary Judgement, the Plaintiff could only provide her own unsupported self-serving affidavit which was nothing more than mere denials of the facts expressed by the Defendants.

The application of the Economic Realities test clearly establishes that the Plaintiff was not economically dependent upon the Defendants, as the Plaintiff was clearly in business for herself. *Scantland*, F 3d 1308 at 1311. Based on the undisputable argument presented herein, the Defendants respectfully request that this Court grant the Defendants' Motion for Summary Judgement.

Respectfully submitted:
*/s/ RANDY M. GOLDBERG, ESQUIRE*
Florida Healthcare Law Firm
151 NW 1st Avenue
Delray Beach, FL 33444
754-224-0867
FBN: 045187
randy@randygoldberglaw.com

## CERTIFICATION OF SERVICE

I hereby certify that a copy of this pleading which was filed with the Clerk of the Court was provided to the Defendant's attorney, Elliot Kozolchyk, Esquire, Koz Law, P.A. 320 SE 9th Street, Fort Lauderdale, FL 33316 @ ekoz@kozlawfirm.com via the Court's ECM/ECF Portal on June 14, 2020.

*/s/ RANDY M. GOLDBERG, ESQUIRE*

10

# Safe N Steady Inc.

## Independent Contractor Contract

This Contract is made and entered into this ___7___ day of _July_ , 20_15_ by and between
Safe N Steady, Inc., herein named the "Registry" and _Laureen Havel_ herein
named the Contractor.

## TERMS

By this contract, the Registry and the Contractor agree to the following terms:

I.   The Registry is the Referrer and _Laureen Havel_ is the Contractor.
II.  The Contractor shall perform all such duties/services as are assigned to him/her by the Client.
III. The Registry shall not deduct taxes from the Contractor's pay.
IV.  The Contractor shall maintain proper liability insurance and make a copy available to our Registry, if applicable.  ☐ Required  ☒ Not Required
V.   The weekly Timesheet notes must verify provision of services and visit completion and must include signature by the Client or the Client's representative if applicable. The Timesheet / Bill sheet or related information for reimbursement for service provided must be received in our office within 1 week (not later than the following Tuesday before 5:00 pm).
VI.  Services to be performed by the Contractor shall be assigned by the Client, Both parties to this contract understand and agree that Clients are accepted for care by this Registry and you are referred to them as a Independent Contractor.
VII. Both parties agree that the Contractor shall conform to all applicable Registry policies, including personnel qualifications as prescribed by the "Agency for HealthCare Administration" (AHCA.)  All Patients health information must be maintained as CONFIDENTIAL as per HIPAA requirements.
VIII. Both parties agree that the Contractor shall be paid an hourly rate of $ _____ or per visit rate of $ _____ during the regular biweekly pay period.
IX.  This contract is subject to automatic annual renewal, if not canceled by any party.
X.   The Contractor must submit evidence of liability insurance if applicable, evidence of current licensure, education or certification and all requirements as mandated by the AHCA.

**EXHIBIT**

_A_

## PROFESSIONAL RESPONSIBILITY

Nothing in this Agreement shall be construed to interfere with or otherwise affect the rendering of services by the Contractor in accordance with his independent and professional judgment. This Agreement shall be subject to the policies and procedures, the rules and regulations of Florida's Agency for Healthcare Administration and the laws and regulations governing said practice in this State.

Both parties agrees that Clients are accepted for care, the service will be coordinated, controlled and evaluated by Client, the Contractor must comply with all scheduling of visits according to Physician order and initial admission assessment, and report any need of schedule change to the Client and Registry immediately upon identifying the need.

## TAX EXEMPT FORM

I, _____Noureen Havel_____ hereby acknowledge that I am an independent Contractor. Therefore, I am responsible for my social security and other taxes, and will receive an IRS 1099 Form for the preceding year by February of each year which is also sent to the Internal Revenue Service (IRS).

## SIGNATURES

Safe N Steady Inc.
Nurse Registry (Registrant)
Administrator or Officer

Sign: _____

Date: 7/7/15

Employee / Contractor

Title: HHA

Sign: _____

Date: 07/07/2015

DFFS-0018

## DURABLE POWER OF ATTORNEY

### OF

### VIRGINIA PEARLMAN

I, VIRGINIA PEARLMAN, with an address of _4701 Pine Tree Dr., Boynton Bch,_ Florida _33463_ make, constitute my son, SOL PEARLMAN, with an address of _4701 Pine Tree Dr., Boynton Bch, FL 33463_, as my agent hereunder. If SOL PEARLMAN dies, becomes legally disabled, resigns, or ceases to act, I make, constitute and nominate my daughter, LORI BEN YOSEF, with an address of 13953 Panay Way – Apt. 120, Marina Del Ray, California 90292, as my agent. My son and my daughter are referred to herein jointly as my "agent". When multiple agents are serving jointly under this durable power of attorney, all of them must act or sign together, except that one or more of the agents may delegate to a co-agent the authority to conduct banking transactions as provided in Section 709.2208(1), Florida Statutes. Furthermore, when multiple agents are named or serving hereunder and any one or more, but not all, die, become legally disabled, resign, or refuse to act, the remaining agent or agents, as the case may be, shall continue to serve in such capacity.

### ARTICLE I

I hereby give and grant unto my said agent full power and authority to act for me in any lawful way with respect to the powers enumerated in Article II, and to the powers which I have initialed in Article III, of this durable power of attorney.

### ARTICLE II

My agent is authorized to act for me in my name, place and stead and may exercise any or all of the powers contained in this Article II.

**2.1    Banking and Other Financial Institution Transactions.** With regard to banking and other financial institution transactions, my agent shall have the authority to conduct banking transactions as provided in section 709.2208(1), Florida Statutes.

**2.2    Investment Transactions.** With regard to stock and bond transactions, my agent shall have the authority to conduct investment transactions as provided in section 709.2208(2), Florida Statutes.

**2.3    Real Property Transactions.** With regard to real property transactions, my agent may exercise all of the following powers with regard to any real property I own: (1) convey or mortgage homestead property; (2) accept as a gift or as security for a loan or reject, demand, buy, lease, receive, or otherwise acquire an interest in real property or a right incident to real property; (3) sell, exchange, convey with or without covenants, quitclaim, release, surrender, mortgage, encumber, partition, consent to partitioning, subdivide, apply for zoning, rezoning, or

1



EXHIBIT

_TS_

other governmental permits, plat or consent to platting, develop, grant options concerning, lease or sublet, or otherwise dispose of an estate or interest in real property or a right incident to real property; (4) release, assign, satisfy, and enforce by litigation, action, or otherwise a mortgage, deed of trust, encumbrance, lien, or other claim to real property that exists or is claimed to exist; (5) do any act of management or of conservation with respect to an interest in real property, or a right incident to real property, owned or claimed to be owned by me, including power to insure against a casualty, liability, or loss; obtain or regain possession or protect the interest or right by litigation, action, or otherwise; pay, compromise, or contest taxes or assessments or apply for and receive refunds in connection with them; and purchase supplies, hire assistance or labor, or make repairs or alterations in the real property; (6) use, develop, alter, replace, remove, erect, or install structures or other improvements on real property in which I have or claim to have an estate, interest, or right; (7) participate in a reorganization with respect to real property or a legal entity that owns an interest in or right incident to real property, receive and hold shares of stock or obligations received in a plan or reorganization, and act with respect to the shares or obligations, including selling or otherwise disposing of the shares or obligations; exercising or selling an option, conversion, or similar right with respect to the shares or obligations; and voting the shares or obligations in person or by proxy; (8) change the form of title of an interest in or right incident to real property; and (9) dedicate easements or other real property in which I have or claim to have an interest to public use, with or without consideration.

  **2.4 Tangible Personal Property Transactions.** With regard to tangible personal property transactions, my agent may exercise all of the following powers: (1) accept as a gift or as security for a loan, reject, demand, buy, receive, or otherwise acquire ownership or possession of tangible personal property or an interest in tangible personal property; (2) sell, exchange, convey with or without covenants, release, surrender, mortgage, encumber, pledge, hypothecate, create a security interest in, pawn, grant options concerning, lease or sublet to others, or otherwise dispose of tangible personal property or an interest in tangible personal property; (3) release, assign, satisfy, or enforce by litigation, action, or otherwise a mortgage, security interest, encumbrance, lien, or other claim on my behalf, with respect to tangible personal property or an interest in tangible personal property; and (4) do an act of management or conservation with respect to tangible personal property or an interest in tangible personal property on my behalf, including insuring against casualty, liability, or loss; obtaining or regaining possession or protecting the property or interest by litigation, action, or otherwise; paying, compromising, or contesting taxes or assessments or applying for and receiving refunds in connection with taxes or assessments; moving from place to place; storing for hire or on a gratuitous bailment; and using, altering, and making repairs or alterations.

  **2.5 Business Operation Transactions.** With regard to business operation transactions, my agent may exercise all of the following powers: (1) operate, buy, sell, enlarge, reduce, or terminate a business interest; (2) to the extent that my agent is permitted by law, to perform a duty or discharge a liability or exercise a right, power, privilege, or option that I have, may have, or claim to have under a partnership agreement, whether or not I am a general or limited partner; (3) to the extent that my agent is permitted by law, to enforce the terms of a partnership agreement by litigation, action, or otherwise; (4) to the extent that my agent is

2

permitted by law, to defend, submit to arbitration, settle, or compromise litigation or an action to which I am a party because of membership in the partnership; (5) exercise in person or by proxy or enforce by litigation, action, or otherwise a right, power, privilege, or option I have or claim to have as the holder of a bond, share, or other instrument of similar character and defend, submit to arbitration, settle, or compromise a legal proceeding to which I am a party because of a bond, share, or similar instrument; (6) with respect to any business owned solely by me, continue, modify, renegotiate, extend, and terminate a contract made with any individual or legal entity, firm, association, or corporation by or on my behalf with respect to the business before execution of the power of attorney; (7) with respect to any business owned solely by me, to determine the location of its operation; the nature and extent of its business; the methods of manufacturing, selling, merchandising, financing, accounting, and advertising employed in its operation; the amount and types of insurance carried; and the mode of engaging, compensating, and dealing with its accountants, attorneys, and other agents and employees; (8) with respect to any business owned solely by me, to change the name or form of organization under which the business is operated and enter into a partnership agreement with other persons or organize a corporation to take over all or part of the operation of the business; (9) with respect to any business owned solely by me, to demand and receive money due or claimed by me or on my behalf in the operation of the business and control and disburse the money in the operation of the business; (10) put additional capital into a business in which I have an interest; (11) join in a plan of reorganization, consolidation, or merger of the business; (12) sell or liquidate a business or part of it at the time and on the terms that my agent considers desirable; (13) establish the value of a business under a buy-out agreement to which I am a party; (14) prepare, sign, file, and deliver reports, compilations of information, returns, or other papers with respect to a business that are required by a governmental agency, department, or instrumentality or that my agent considers desirable and make related payments; and (15) pay, compromise, or contest taxes or assessments and do any other act that my agent considers desirable to protect me from illegal or unnecessary taxation, fines, penalties, or assessments with respect to a business, including attempts to recover, in any manner permitted by law, money paid before or after the execution of the power of attorney.

**2.6      Insurance Transactions.** With regard to insurance transactions, my agent may exercise all of the following powers: (1) continue, pay the premium or assessment on, modify, rescind, release, or terminate a contract procured by or on my behalf that insures or provides an annuity to either me or another person, whether or not I am a beneficiary under the contract; (2) procure new, different, or additional contracts of insurance and annuities for me or my spouse, children, and other dependents and select the amount, type of insurance or annuity, and mode of payment; (3) pay the premium or assessment on or modify, rescind, release, or terminate a contract of insurance or annuity procured by my agent; (4) apply for and receive a loan on the security of the contract of insurance or annuity; (5) surrender and receive the cash surrender value of a contract of insurance or annuity; (6) exercise an election; (7) change the manner of paying premiums; (8) change or convert the type of insurance contract or annuity with respect to which I have or claim to have a power described in this section; (9) apply for and procure government aid to guarantee or pay premiums of a contract of insurance on my life; (10) collect, sell, assign, hypothecate, borrow on, or pledge my interest in a contract of insurance or annuity;

3

and (11) pay from proceeds or otherwise, compromise or contest, or apply for refunds in connection with a tax or assessment levied by a taxing authority with respect to a contract of insurance or annuity or its proceeds or liability accruing because of the tax or assessment.

**2.7     Estate, Trust, and Other Beneficiary Transactions.** With regard to estate, trust, and other beneficiary transactions, my agent may act for me in all matters that affect a trust, probate estate, guardianship, conservatorship, escrow, custodianship, or other fund from which I am, may become, or claim to be entitled, as a beneficiary, to a share or payment, including to: (1) accept, reject, receive, receipt for, sell, assign, release, pledge, exchange, or consent to a reduction in or modification of a share in or payment from the fund; (2) demand or obtain by litigation, action, or otherwise money or any other thing of value to which I am, may become, or claim to be entitled because of the fund; (3) initiate, participate in, or oppose a legal or judicial proceeding to ascertain the meaning, validity, or effect of a deed, will, declaration of trust, or other instrument or transaction affecting my interest; (4) initiate, participate in, or oppose a legal or judicial proceeding to remove, substitute, or surcharge a fiduciary; (5) conserve, invest, disburse, or use anything received for an authorized purpose; and (6) transfer all or part of my interest in real property, stocks, bonds, accounts with financial institutions, insurance, and other property to the trustee of a revocable trust created by me as settlor.

**2.8     Claims and Litigation.** With regard to claims and litigation, my agent has the power to: (1) assert and prosecute before a court or administrative agency a claim, a claim for relief, a counterclaim, or an offset or defend against an individual, a legal entity, or a government, including suits to recover property or other thing of value, to recover damages sustained by me, to eliminate or modify tax liability, or to seek an injunction, specific performance, or other relief; (2) bring an action to determine adverse claims, intervene in an action or litigation, and act as amicus curiae; (3) in connection with an action or litigation, procure an attachment, garnishment, libel, order of arrest, or other preliminary, provisional, or intermediate relief and use an available procedure to effect or satisfy a judgment, order, or decree; (4) in connection with an action or litigation, perform any lawful act I could perform, including acceptance of tender, offer of judgment, admission of facts, submission of a controversy on an agreed statement of facts, consent to examination before trial, and binding of me in litigation; (5) submit to arbitration, settle, and propose or accept a compromise with respect to a claim or litigation; (6) waive the issuance and service of process on me, accept service of process, appear for me, designate persons on whom process directed to me may be served, execute and file or deliver stipulations on my behalf, verify pleadings, seek appellate review, procure and give surety and indemnity bonds, contract and pay for the preparation and printing of records and briefs, or receive and execute and file or deliver a consent, waiver, release, confession of judgment, satisfaction of judgment, notice, agreement, or other instrument in connection with the prosecution, settlement, or defense of a claim or litigation; (7) act for me with respect to bankruptcy or insolvency proceedings, whether voluntary or involuntary, concerning me or some other person, with respect to a reorganization proceeding or a receivership or application for the appointment of a receiver or trustee that affects my interest in real or personal property or other thing of value; and (8) pay a judgment against me or a settlement made in connection with a claim or litigation and receive and conserve money or

4

other thing of value paid in settlement of or as proceeds of a claim or litigation.

**2.9    Personal and Family Maintenance.** With regard to personal and family maintenance, my agent may exercise all of the following powers: (1) perform the acts necessary to maintain the customary standard of living of me, my spouse and children, and other individuals customarily or legally entitled to be supported by me, including providing living quarters by purchase, lease, or other contract, or paying the operating costs, including interest, amortization payments, repairs, and taxes on premises owned by me and occupied by those individuals; (2) provide for the individuals described by Subsection (1) of this section normal domestic help, usual vacations and travel expenses, and funds for shelter, clothing, food, appropriate education, and other current living costs; (3) pay necessary medical, dental, and surgical care, hospitalization, and custodial care for the individuals described by Subsection (1) of this section; (4) continue any provision made by me for the individuals described by Subsection (1) of this section, for automobiles or other means of transportation, including registering, licensing, insuring, and replacing the automobiles or other means of transportation; (5) maintain or open charge accounts for the convenience of the individuals described by Subsection (1) of this section and open new accounts that my agent considers desirable to accomplish a lawful purpose; and (6) continue payments incidental to my membership or affiliation in a church, club, society, order, or other organization or to continue contributions to those organizations.

**2.10    Benefits From Certain Governmental Programs or Civil or Military Service.** With regard to benefits from social security, Medicare, Medicaid, or other governmental programs or civil or military service, my agent has the power to: (1) execute vouchers in my name for allowances and reimbursements payable by the United States, a foreign government, or a state or subdivision of a state to me, including allowances and reimbursements for transportation of the individuals described by Section 2.09(1) of this durable power of attorney, and for shipment of their household effects; (2) take possession and order the removal and shipment of my property from a post, warehouse, depot, dock, or other place of storage or safekeeping, either governmental or private, and execute and deliver a release, voucher, receipt, bill of lading, shipping ticket, certificate, or other instrument for that purpose; (3) prepare, file, and prosecute a claim to a benefit or assistance, financial or otherwise, to which I claim to be entitled under a statute or governmental regulation; (4) prosecute, defend, submit to arbitration, settle, and propose or accept a compromise with respect to any benefits I may be entitled to receive; and (5) receive the financial proceeds of a claim of the type described in this Section 2.10 of this durable power of attorney and conserve, invest, disburse, or use anything received for a lawful purpose.

**2.11    Retirement Plan Transactions.** With regard to retirement plan transactions, my agent may exercise all of the following powers: (1) apply for service or disability retirement benefits; (2) select payment options under any retirement plan in which I participate, including plans for self-employed individuals; (3) make voluntary contributions to retirement plans if authorized by the plan; (4) exercise the investment powers available under any self-directed retirement plan; (5) make "rollovers" of plan benefits into other retirement plans; (6) borrow

from, sell assets to, and purchase assets from retirement plans if authorized by the plan; (7) receive, endorse, and cash payments from a retirement plan; and (8) request and receive information relating to me and my retirement plan records.

**2.12   Tax Matters.** With regard to tax matters, my agent may exercise all of the following powers: (1) prepare, sign, and file federal, state, local, and foreign income, gift, payroll, Federal Insurance Contributions Act, and other tax returns, claims for refunds, requests for extension of time, petitions regarding tax matters, and any other tax-related documents, including receipts, offers, waivers, consents, including consents and agreements under Section 2032A of the Internal Revenue Code of 1986, as amended, (the "Code"), closing agreements, and any power of attorney form required by the Internal Revenue Service or other taxing authority with respect to a tax year on which the statute of limitations has not run and 25 tax years following that tax year; (2) pay taxes due, collect refunds, post bonds, receive confidential information, and contest deficiencies determined by the Internal Revenue Service or other taxing authority; (3) exercise any election available to me under federal, state, local, or foreign tax law; (4) act for me in all tax matters for all periods before the Internal Revenue Service and any other taxing authority; and (5) represent me, and appoint an agent or agents to represent me, before the Internal Revenue Service or any State or other taxing authority by completing, signing, and submitting IRS Form 2848 or any other governmental form.

**2.13   Existing and Foreign Interests.** The powers described in Article II of this durable power of attorney may be exercised equally with respect to an interest I have at the time this durable power of attorney is executed or an interest which I acquire later, whether or not the interest is located in Florida and whether or not the powers are exercised or the durable power of attorney is executed in Florida.

**2.14   Digital Assets.** To access any online accounts I have, either in my own name or jointly with anyone, including but not limited to email, bank accounts, brokerage accounts, Internet service providers, retail vendors, utilities, mutual funds and the like; to change my username and password as necessary to gain access to my accounts or information, and to open new accounts and close accounts as my agent determines is necessary or advisable and in my best interests; and to transfer funds among my accounts as my agent deems necessary or advisable.

**2.15   Separation and Divorce.** If my spouse has been designated as my agent or alternate agent under this instrument and, if subsequent to the execution of this document, my spouse and I are legally separated or divorced, any rights and powers granted to my spouse shall immediately terminate on such legal separation or divorce.

## ARTICLE III

My agent is authorized to perform the following specific acts for me if I have initialed the specific authority listed below:

6

**Initial:**

_(VP)_     **Power to Make Annual Exclusion Gifts.** I grant to my agent the power to make gifts (outright, in trust, or otherwise) of any of my property to or to pay amounts on behalf of any person in an amount per donee which qualifies for the Federal gift tax annual exclusion under Section 2503(b) of the Internal Revenue Code of 1986, as amended, or if I am married at the time and my spouse agrees to split gifts for Federal gift tax purposes, in an amount per donee which qualifies for twice the Federal gift tax annual exclusion, or to any charitable organization to which deductible gifts may be made under the income and gift tax provisions of the Code.

_(VP)_     **Power to Make Gifts to Qualify for Public Benefits.** If my agent in my agent's sole discretion has determined that I need nursing home or other long-term medical care and that I will receive proper medical care whether I privately pay for such care or if I am a recipient of Title XIX (Medicaid) or other public benefits, then my agent shall have the power: (i) to take any and all steps necessary, in my agent's judgment, to obtain and maintain my eligibility for any and all public benefits and entitlement programs, including, if necessary, creating and funding a qualified income trust or special needs trust for me or a disabled child, if any; (ii) to transfer with or without consideration my assets to my descendants (if any), or to my natural heirs at law or to the persons named as beneficiaries under my last will and testament or a revocable living trust which I may have established, including my agent; and (iii) to enter into a personal services contract for my benefit, including entering into such contract with my agent, and even if doing so may be considered self-dealing. Such public benefits and entitlement programs shall include, but are not limited to, Social Security, Supplemental Security Income, Medicare, Medicaid and Veterans benefits.

_(VP)_     **Waive My Right to be a Beneficiary of Joint and Survivor Annuity, Including a Survivor Benefit Under a Retirement Plan.** My agent shall have the power to waive my right to be a beneficiary of a joint and survivor annuity, including a survivor benefit under a retirement plan. This waiver right shall apply to an annuity or retirement plan which is owned by me, in which I am a participant, or in which I am a beneficiary.

_(VW)_     **Disclaim Property and Powers of Appointment.** My agent shall have the power to disclaim any property, including a power of appointment, and also including any legacy, bequest, devise, gift, or other property interest or payment due or payable to me.

## ARTICLE IV

Notwithstanding any provision herein to the contrary, any authority granted to my agent

7

shall be limited so as to prevent this durable power of attorney from causing my agent to be taxed on my income (unless my agent is my spouse) and from causing my assets to be subject to a general power of appointment by my agent, as that term is defined in Section 2041 of the Code.

## ARTICLE V

Any act or thing lawfully done hereunder by my said agent shall be binding on myself and my heirs, legal and personal representatives, and assigns, provided, however, that all business transacted hereunder for me or for my account shall be transacted in my name, and that all endorsements and instruments executed by my said agent for the purpose of carrying out the foregoing powers shall contain my name, followed by that of my said agent and the designation "Agent."

## ARTICLE VI

Any third party may transact any matter with my agent in the same manner and to the same extent as the third party would transact such matter with me. Third parties who act in reliance upon the representations of my agent shall be held harmless by me, my estate, the beneficiaries of my estate, or joint owners of property from any loss suffered or liability incurred as a result of actions taken prior to receipt of written notice of revocation, suspension, notice of a petition to determine incapacity, partial or complete termination, or my death. Any third party may rely upon a copy of this durable power of attorney certified by my agent to be a true copy of the original hereof, as fully as if such third party had received an original of this durable power of attorney.

## ARTICLE VII

My agent shall not be liable for any acts or decisions made in good faith and in conformity with the powers enumerated in this durable power of attorney. However, my agent shall not be relieved from liability for breach of duty committed dishonestly, with improper motive, or with reckless indifference to me or the purposes of this durable power of attorney.

## ARTICLE VIII

My agent shall have the power to pay a reasonable fee from my estate to each agent who is a qualified agent as defined in Section 709.2112(4), Florida Statutes as compensation for services rendered under this durable power of attorney in an amount which does not exceed the customary and prevailing charges for services of a similar character at the time and place such services are performed. My agent shall also be entitled to reimbursement of expenses reasonably incurred on my behalf.

## ARTICLE IX

I hereby revoke all prior general powers of attorney executed by me. However, I do not

hereby revoke any powers of attorney I have previously executed for a limited or specific purpose, or powers of attorney I have executed as part of a contract for the management of any bank or brokerage account. If I desire to revoke any such prior limited or specific power of attorney, I will execute a revocation specifically referring to the power of attorney to be revoked.

## ARTICLE X

This durable power of attorney is not terminated by subsequent incapacity of the principal except as provided in chapter 709, Florida Statutes. This durable power of attorney shall terminate by one or more of the following circumstances:

(1) My death;
(2) The death or deaths of all agents named in the first paragraph of this durable power of attorney; or
(3) The occurrence of an event described in Section 709.2109, Florida Statutes.

## ARTICLE XI

Notwithstanding the powers contained in this durable power of attorney, my attorney in fact may not:

(1)   Perform duties under a contract that requires the exercise of my personal services;
(2)   Make any affidavit as to my personal knowledge;
(3)   Vote in any public election on my behalf;
(4)   Execute or revoke any will or codicil on my behalf;
(5)   Create, amend, modify, or revoke any document or other disposition effective at my death;
(6)   Exercise powers and authority granted to me as trustee or as court-appointed fiduciary.

Signed on the 25 day of July, in the year 2017.


VIRGINIA PEARLMAN, Principal

9

WITNESSES (both of whom are
18 years of age or older):

_____
KARIN DRAKAS
(Printed Name)
Witness

_____
Tara Zabala
(Printed Name)
Witness

STATE OF FLORIDA                    §
                                    §
COUNTY OF PALM BEACH                §

Before me, the undersigned authority, on this day personally appeared VIRGINIA PEARLMAN,
who is personally known to me or who has produced _____NY Dr 's Lic_____ (type of
identification) as identification proving her to be the person whose name is subscribed to the
foregoing instrument as Principal, _Karin Drakas_, a witness who is personally
known to me or who has produced _____ (type of identification) as
identification, and _Tara Zabala____, a witness who is personally known to me or
who has produced _____ (type of identification) as identification,
each of whom acknowledged to me that such Principal executed the foregoing instrument in the
presence of such witnesses for the purposes and consideration therein expressed.

    Given under my hand and seal of office, on the _25_ day of _July_____, in
the year 2017

_____
Notary Public, State of Florida
Notary's printed name: _____



Notary Public State of Florida
Alfred G Morici
My Commission FF 930751
Expires 11/04/2019

10

## DESIGNATION OF HEALTH CARE SURROGATE
## AND HIPAA RELEASE AUTHORIZATION

### OF

### VIRGINIA PEARLMAN

I, VIRGINIA PEARLMAN, designate as my health care surrogate under s. 765.202, Florida Statutes:

Name:        SOL PEARLMAN
Address:     4701 Pine Tree Drive
             Boynton Beach, Florida 33436
Phone:       Cell: (516) 650-3828

If SOL PEARLMAN is not willing, able, or reasonably available to perform his/her duties, I designate as my alternate health care surrogate:

Name:        LORI BEN YOSEF
Address:     13953 Panay Way – Apt. 120
             Marina Del Ray, CA 90292
Phone:       Cell: (310) 650-2009

### INSTRUCTIONS FOR HEALTH CARE

I authorize my health care surrogate to:

_U P_
(initial here)

Receive any of my health information, whether oral or recorded in any form or medium, that:

1. Is created or received by a health care provider, health care facility, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and

2. Relates to my past, present, or future physical or mental health or condition; the provision of health care to me; or the past, present, or future payment for the provision of health care to me.

I further authorize my health care surrogate to:

_U P_
(initial here)

Make all health care decisions for me, which means he or she has the authority to:

1

1. Provide informed consent, refusal of consent, or withdrawal of consent to any and all of my health care, including life-prolonging procedures.

2. Apply on my behalf for private, public, government, or veterans' benefits to defray the cost of health care.

3. Access my health information reasonably necessary for the health care surrogate to make decisions involving my health care and to apply for benefits for me.

4. Decide to make an anatomical gift pursuant to part V of chapter 765, Florida Statutes.

## SPECIFIC INSTRUCTIONS AND RESTRICTIONS

~~I hereby require~~ my surrogate to direct my physicians to comply with any valid Living Will, Directive to Physicians, or similar document which I may have heretofore executed or which I may hereafter execute. My surrogate is not authorized to direct my physician in a manner which would contradict any such valid Living Will, Directive to Physicians, or similar document.

(initial here)

While I have decision-making capacity, my wishes are controlling and my physicians and health care providers must clearly communicate to me the treatment plan or any change to the treatment plan prior to its implementation.

To the extent I am capable of understanding, my health care surrogate shall keep me reasonably informed of all decisions that he or she has made on my behalf and matters concerning me.

If my Spouse has been designated as my health care surrogate or alternate health care surrogate under this instrument and, if subsequent to the execution of this document, my Spouse and I are legally separated or divorced, any rights and powers granted to my Spouse shall immediately terminate on such legal separation or divorce.

A copy of this document shall be as valid as the original.

THIS HEALTH CARE SURROGATE DESIGNATION IS NOT AFFECTED BY MY SUBSEQUENT INCAPACITY EXCEPT AS PROVIDED IN CHAPTER 765, FLORIDA STATUTES.

PURSUANT TO SECTION 765.104, FLORIDA STATUTES, I UNDERSTAND THAT I MAY, AT ANY TIME WHILE I RETAIN MY CAPACITY, REVOKE OR AMEND THIS

DESIGNATION BY:

(1) SIGNING A WRITTEN AND DATED INSTRUMENT WHICH EXPRESSES MY INTENT TO AMEND OR REVOKE THIS DESIGNATION;

(2) PHYSICALLY DESTROYING THIS DESIGNATION THROUGH MY OWN ACTION OR BY THAT OF ANOTHER PERSON IN MY PRESENCE AND UNDER MY DIRECTION;

(3) VERBALLY EXPRESSING MY INTENTION TO AMEND OR REVOKE THIS DESIGNATION; OR

(4) SIGNING A NEW DESIGNATION THAT IS MATERIALLY DIFFERENT FROM THIS DESIGNATION.

MY HEALTH CARE SURROGATE'S AUTHORITY BECOMES EFFECTIVE WHEN MY PRIMARY PHYSICIAN DETERMINES THAT I AM UNABLE TO MAKE MY OWN HEALTH CARE DECISIONS UNLESS I INITIAL EITHER OR BOTH OF THE FOLLOWING BOXES:

IF I INITIAL THIS BOX, MY HEALTH CARE SURROGATE'S AUTHORITY TO RECEIVE MY HEALTH INFORMATION TAKES EFFECT IMMEDIATELY.

 IF I INITIAL THIS BOX, MY HEALTH CARE SURROGATE'S AUTHORITY TO MAKE HEALTH CARE DECISIONS FOR ME TAKES EFFECT IMMEDIATELY. PURSUANT TO SECTION 765.204(3), FLORIDA STATUTES, ANY INSTRUCTIONS OR HEALTH CARE DECISIONS I MAKE, EITHER VERBALLY OR IN WRITING, WHILE I POSSESS CAPACITY SHALL SUPERCEDE ANY INSTRUCTIONS OR HEALTH CARE DECISIONS MADE BY MY SURROGATE THAT ARE IN MATERIAL CONFLICT WITH THOSE MADE BY ME.

**DEFINITIONS**

The following definitions as set forth in Section 765.101 of the Florida Statutes shall apply:

1.      "Advance directive" means a witnessed written document or oral statement in which instructions are given by a principal or in which the principal's desires are expressed concerning any aspect of the principal's health care or health information, and includes, but is not limited to, the designation of a health care surrogate, a living will, or an anatomical gift made pursuant to part V of chapter 765 of the Florida Statutes.

3

2.      "Attending physician" means the primary physician who has responsibility for the treatment and care of the patient while the patient receives such treatment or care in a hospital as defined in Section 395.002(12) of the Florida Statutes.

3.      "Close personal friend" means any person 18 years of age or older who has exhibited special care and concern for the patient, and who presents an affidavit to the health care facility or to the primary physician stating that he or she is a friend of the patient; is willing and able to become involved in the patient's health care; and has maintained such regular contact with the patient so as to be familiar with the patient's activities, health, and religious or moral beliefs.

4.      "End-stage condition" means an irreversible condition that is caused by injury, disease, or illness which has resulted in progressively severe and permanent deterioration, and which, to a reasonable degree of medical probability, treatment of the condition would be ineffective.

5.      "Health Care" means care, services, or supplies related to the health of an individual and includes, but is not limited to, preventive, diagnostic, therapeutic, rehabilitative, maintenance, or palliative care, and counseling, service, assessment, or procedure with respect to the individual's physical or mental condition or functional status or that affect the structure or function of the individual's body.

6.      "Health care decision" means: (a) Informed consent, refusal of consent, or withdrawal of consent to any and all health care, including life-prolonging procedures and mental health treatment, unless otherwise stated in the advance directives. (b) The decision to apply for private, public, government, or veterans' benefits to defray the cost of health care. (c) The right of access to health information of the principal reasonably necessary for a health care surrogate or proxy to make decisions involving health care and to apply for benefits. (d) The decision to make an anatomical gift pursuant to part V of chapter 765 of the Florida Statutes.

7.      "Health care facility" means a hospital, nursing home, hospice, home health agency, or health maintenance organization licensed in this state, or any facility subject to part I of chapter 394 of the Florida Statutes.

8.      "Health care provider" or "provider" means any person licensed, certified, or otherwise authorized by law to administer health care in the ordinary course of business or practice of a profession.

9.      "Health information" means any information, whether oral or recorded in any form or medium, as defined in 45 C.F.R. s. 160.103 and the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. s. 1320d, as amended, that: (a) Is created or received by a health care provider, health care facility, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and (b) Relates to the past, present, or

4

future physical or mental health or condition of the principal; the provision of health care to the principal; or the past, present, or future payment for the provision of health care to the principal.

10.     "Incapacity" or "incompetent" means the patient is physically or mentally unable to communicate a willful and knowing health care decision. For the purposes of making an anatomical gift, the term also includes a patient who is deceased.

11.     "Informed consent" means consent voluntarily given by a person after a sufficient explanation and disclosure of the subject matter involved to enable that person to have a general understanding of the treatment or procedure and the medically acceptable alternatives, including the substantial risks and hazards inherent in the proposed treatment or procedures, and to make a knowing health care decision without coercion or undue influence.

12.     "Life-prolonging procedure" means any medical procedure, treatment, or intervention, including artificially provided sustenance and hydration, which sustains, restores, or supplants a spontaneous vital function. The term does not include the administration of medication or performance of medical procedure, when such medication or procedure is deemed necessary to provide comfort care or to alleviate pain.

13.     "Living will" or "declaration" means: (a) A witnessed document in writing, voluntarily executed by the principal in accordance with Florida Statute 765.302; or (b) A witnessed oral statement made by the principal expressing the principal's instructions concerning life-prolonging procedures.

14.     "Persistent vegetative state" means a permanent and irreversible condition of unconsciousness in which there is: (a) The absence of voluntary action or cognitive behavior of any kind. (b) An inability to communicate or interact purposefully with the environment.

15.     "Physician" means a person licensed pursuant to chapter 458 or chapter 459 of the Florida Statutes.

16.     "Primary physician" means a physician designated by an individual or the individual's surrogate, proxy, or agent under a durable power of attorney as provided in chapter 709, to have primary responsibility for the individual's health care or, in the absence of a designation or if the designated physician is not reasonably available, a physician who undertakes the responsibility.

17.     "Principal" means a competent adult executing an advance directive and on whose behalf health care decisions are to be made or health care information is to be received, or both.

18.     "Proxy" means a competent adult who has not been expressly designated to make health care decisions for a particular incapacitated individual, but who, nevertheless, is authorized pursuant to Florida Statute 765.401 to make health care decisions for such individual.

19.     "Reasonably available" means readily able to be contacted without undue effort and willing and able to act in a timely manner considering the urgency of the patient's health care needs.

20.     "Surrogate" means any competent adult expressly designated by a principal to make health care decisions and to receive health information. The principal may stipulate whether the authority of the surrogate to make health care decisions or to receive health information is exercisable immediately without the necessity for a determination of incapacity or only upon the principal's incapacity as provided in Florida Statute 765.204 on behalf of the principal upon the principal's incapacity.

21.     "Terminal condition" means a condition caused by injury, disease, or illness from which there is no reasonable medical probability of recovery and which, without treatment, can be expected to cause death.

## HIPAA RELEASE AUTHORITY

I intend for my surrogate to be treated as I would be treated with respect to my rights regarding the use and disclosure of my individually identifiable health information and other medical records. This release authority applies to any information governed by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 USC 1320d and 45 CFR 160-164. This release authority is effective immediately.

Accordingly, I hereby authorize any doctor, physician, medical specialist, psychiatrist, chiropractor, health-care professional, dentist, optometrist, health plan, hospital, hospice, clinic, laboratory, pharmacy or pharmacy benefit manager, medical facility, pathologist, or other provider of medical or mental health care, as well as any insurance company and the Medical Information Bureau Inc. or other health-care clearinghouse that has paid for or is seeking payment from me for such services (referred to herein as a "covered entity"), to give, disclose and release to my surrogate who is named herein, without restriction, all of my individually identifiable health information and medical records regarding any past, present or future medical or mental health condition, including all information relating to the diagnosis and treatment of HIV/AIDS, sexually transmitted diseases, mental illness, and drug or alcohol abuse. Additionally, my surrogate shall have the ability to ask questions and discuss my protected medical information with the person or entity who has possession of the protected medical information even if I am fully competent to ask questions and discuss this matter at the time. It is my intention to give a full authorization to any protected medical information to my surrogate. Such information may also be released to any person designated as a primary or successor agent or attorney-in-fact in a durable power of attorney which I have executed, whether or not such person is presently serving as such, and to any person presently serving as trustee or named as a successor trustee in any revocable or irrevocable trust created by me as settlor.

In determining whether I am incapacitated, all individually identifiable health information and medical records shall be released to the person who is nominated as my

6

surrogate hereunder, including any written opinion relating to my incapacity that the person nominated as my surrogate may have requested. This release authority applies to any information governed by HIPAA and applies even if that person has not yet begun serving as my surrogate.

This authority given to my surrogate shall supersede any prior agreement that I may have made with my health-care providers to restrict access to or disclosure of my individually identifiable health information. The individually identifiable health information and other medical records given, disclosed, or released to my surrogate may be subject to redisclosure by my surrogate and may no longer be protected by HIPAA. I authorize my agent to bring a legal action against a covered entity which refuses to accept and recognize this release authority. No covered entity may condition treatment, payment, enrollment or eligibility for benefits on whether I sign this authorization when the prohibition on conditioning of authorizations in 45 CFR 164.508(b)(4) applies. Further, in order to fulfill my intent as expressed herein, I authorize my agent to sign any documentation that my agent deems necessary or appropriate in order to secure the disclosure of my individually identifiable health information and other medical records. Any information disclosed to my agent may subsequently be disclosed to another party by my agent. My agent shall not be required to indemnify a covered entity or perform any act in the event information is subsequently disclosed by my agent. The authority given to my surrogate herein has no expiration date and shall expire only in the event that I revoke this Designation of Health Care Surrogate in writing and deliver it to my health-care provider. There are no exceptions to my right to revoke this Designation of Health Care Surrogate.

### PRIOR DESIGNATIONS REVOKED

I revoke any prior Designation of Health Care Surrogate or similar document.

**SIGNATURE:**

Dated: the _25_ day of _July_, in the year 2017.

_Virginia Pearlman_
VIRGINIA PEARLMAN
4701 Pine Tree Drive
Boynton Beach, Florida 33436

**SIGNATURES OF WITNESSES:**

Signature: _____

Print Name: _____KARIN DRAKAS_____

Address: ____712 US Highway One #400____

____NPB, FL 33408____

Date: ____July 25____, 2017

Signature: _____Tara Zabala_____

Print Name: _____Tara Zabala_____

Address: ____712 US Hwy 1 # 400____

____NPB   FL   33408____

Date: ____July 25____, 2017

8



## MORNING ROUTINE:

While IN BED/BRKFST 184
TAKE TEMP/LOOK FOR Swelling
RECORD BP/oxygen →

unload dishwasher - Clean + Clear Kitchen -

Before Waking Ginger - Mix water + powdered (x2 Capsea)
x2 vitamins + Shake Well. ② place AM Meds in 5ml Top
Bring to her bathroom + set down on Sink (Lights On!)
③ Open window ½ way to let light in her room ("Good Mornin!)
④ (Wash) + Change her wound wraps (Gloves) →
⑤ Sit her up + Remove Night Shirt (urine) leave it on bed
mat + guide her to her bathroom, Remove pants + undies
(garbage) take pants + Night Shirt + bed pad straight to washer
+ Start it! ⑥ Give her medication while on Potty + take
the garbage to the garage (quickly) ⑦ Make +/or Change
bedding (leave her on potty for privacy) ⑧ Cover Wound with
plastic - Cover her hair with shower cap (unless washing)
⑨ Flush + Wipe (Go to Shower (She must hold the bar!)
w/bleach Warm the Water + begin! ⑩ Dry →
her hair + back, butt + legs ⑪ Turn to Front + hold bar
by Door, Remove Hair Cap + Finish Drying to the thigh ⑫ Walk
to Potty + Sit ⑬ Remove Leg Cover + Finish Drying Completely.
⑭ Put Towel across tigs + lotion, Deodorize top half (Perfume)
⑮ Brush Teeth + Clean Ears Well! ⑯ Bra + Blouse ⑰ Hang Towel
to Dry + Lotion Bottom Half ⑱ Undies + Xtra Pad On ⑲ Pants
on! ⑳ Shoes On ㉑ Wipe face Completely Clean + Begin Make-Up
㉑ Stand-Up + Pull-Up Pants (Potty time Done!) ㉒ Pull
Chair in bathroom + have her Sit in it! ㉓ Begin + Finish
her hair ㉔ Walk to Dresser + Add Jewelry ㉕ Walk her
to Kitchen (Table or Counter) after Seated put Napkin/Bib then give
a fruit or yogurt While Preparing Hot Breakfast ㉖ Serve Brkfst

Morning Routine:

(27) Observe Bkfst throughout (28) Give V8 + Remove her plate, clear area + go back for empty glass + load dishwasher (29) Seat Mrs. Pearlman in living area with TV (30) Finish all laundry + Cleaning of Kitchen (31) Go Ready Yourself for departure (32) Make sure you have bag ready with a change + wipes (33) Take Mrs. Pearlman one last time before leaning to the Bathroom, make sure everything is Okay before you leave for your day — (34) HAVE FUN — Also when you return to everything clean you'll be very glad because most likely you will be very tired + there's more for you to do — You will begin your night routine, unless you return midday for a break.

## MID-DAY Routine—

① Bathroom immediately — change undies — refresh makeup + hair + when needed Change entire outfit. ② Suggest sitting in the living area to relax before heading out for the evening. ③ Television on (she'll usually snooze if she's tired) Let her ④ Before departure quick stop to the bathroom (very important) ⑤ Go Have FUN!

## Night Routine:                    *Home*

1. When returning home ... Walk Mrs. Pearlman into her bedroom 1st. go to her dresser + Remove + account for all jewelry 2. Put jewelry in it's proper place — 3. Walk Mrs. Pearlman *(place in laundry)* to her bathroom + remove her clothing + seat her on the potty 4. Quickly turn her bed down 5. Collect her night meds + set them on *(Bladder)* bathroom counter 6. Put night shirt, undies to knees + night pants to knees + put night socks on her feet 7. Give her PM medication + observe 8. Pull her hair away from her face + Remove her make-up completely 9. Apply her moisturizer + Comb her hair 10. Her bladder hopefully will be empty by now, if not wipe her + pull her bottoms up anyway. 11. Walk her to her bed + Secure her for the evening. 12. All lights should be off in her bedroom + her window slide closed. 13. Take the *(ALWAYS SAY GOOD NIGHT)* garbage directly to the garage + Leave her bathroom light on low + Close her door (if she opens it ... you'll hear it) 14. On your way back make sure to ~~leave~~ both lights on in the garage + Lock The Door. 15. Laundry Room light off + Door Locked 16. Be sure the Baby Monitor IS ON in your Room (Green Light) 17. Good Night ————

*Haroff*                    Night Routine:

NOTES => ADULT UNDIES (M) BJ'S
              (DISCOVER) GAS — BJ'S or 7/11
X3 OR X5 EQUATE WIPES — WALMART
PR     BK
   X2 PK NEUTROGENA PADS — WALMART (make-Up Remover)
   X4 PK TOOTH PASTE — BJ'S  (CREST WHITENING)
    X2 PK DEODORANT — BJ'S  (DOVE SPRAY or Stick)
    X2 PK LOTIONS — BJ'S  (coconut / SHEA)
whatever
they have — DIAPER GENIE REFILLS — WALMART
Buy 5-6-7  FRUITS / VEGGIES / MEATS = WESTERN BEEF
    DRINKS (water, Juice, Snack Bars, yogurt) — ALDI'S
    NEUTROGENA LIQUID SOAP (SHOWER)
     $19 ea Buy 4-6 Lg @ Bed Bath Beyond
    Egg Whites — ALDIS
    ALMOND MILK — ALDIS
    SEAFOOD — WESTERN BEEF (Shrimp/SCALLOPS/SALMON
    FIRST AID (Bandages - creams) PUBLIX or WALMART
    SUSHI — PUBLIX (check Date) TUNA ROLL
    NO 7 (Products - DAY CREAM / NIGHT Cream - Foundation — Walgreen
(Wool BRIGHT + Military) MNGR. ORDERS FOR HER!

Prescriptions = WALGREEN'S RX + WOOL BRIGHT / MILITARY.

# DAYS:

NICOLE
MARTHA
CAROL
ELLIE
GINNY

Movies of Atlantic
Delray:
Hoagan Ranch Atlantic

Boynton Beach
Senior Cent

## Monday — "MOST DR. APPTS. are on mondays"
LINE DANCING @ SR CENTER 12:30 — 1:30
2PM OCEAN ONE $5/ Lunch (Salmon/ Salad) Tea
MOVIES @ DELRAY (3:40 or 4 or 4:10PM) Atlantic Ave

PATTY + RAY

## Tuesday — 12-2PM Line Dancing @ Boynton Sr (4x)
W/ Ginny + Ellie — Late Lunch @ Ale Hse - Stk, Pot + Salad
3 inf + Water W/ Lemon → Ref bowl Boca Delray Rec Center

BOB + Marlene

## Wednesday — 5/1, 5/15, 5/22 @ 2pm, 5/29
2:15pm Wound Care Appt. W/ DR. O'HARA - BOCA RATON
Benny's on The Beach (Bot. Water, 3 inf, Lobster Salad W/ Avocado / Fruit +

RICK + MARILYN
PATRICIA
BOB - ETHAN
LINDA

## Thursday — 11:30 am Boynton Sr. Center Ballroom
Dance Lesson W/ Ethan $8 CASH $2 Water - Bthen Brk - 1-3PM
Band + Dance (very Important) Late Lunch @ Sweet Tomato

Lenni
Elaine
JANET
IRENE
IRIS
MARLENE

## Friday — 5/10, 6/7, 7/12, 8/16, 9/20
1PM HAIR APPOINTMENTS
(Sleep In - Eat @ Home) MOVIES @ Lake Worth (3-4 or 5PM)

## Saturday — Ladies Brunch 12:30 - 3PM @
Woolbright Cracker Barrell or Palm Diner (Boynton)
Rick + Marilyn (PICK-UP Chinese Gateway) Go to Their Condo
EAT DRINK + Go to Clubhouse or Pool or Patio, Easy Hours

LINDA
PATRICIA

## Sunday — (SLEEP IN - BAGEL & NOVA W/ Sol)
Easy Day TV @ Home etc + prepare for night time.

## Temple Ashai Shalom: ((Delray Sr Center))
has shows + pamplets + schedules are
just inside. MOST tickets are $10 - $30

## NIGHTS:

FOOD & DRINK

**Monday** — Brogues 7pm-11pm (Lakeworth)

Kitchen Closes early MOOSE — (Bowman St) 6:30-10pm (DRINK)

Apple Bees 5pm-9pm Music + CK Salad (grilled)

**Tuesday** — Avantis Karaoke (Billy) 6pm-10pm

Anchor Inn — 6-10pm (Jacquie) Food + Drink

Mels Way 6-10 Karaoke (Dinner)

**Wednesday** — Atlantis Grille 6pm-10pm ✶
DINE + MUSIC (Live)

Karaoke- Bennys on The Beach 11AM-8PM EAT & DRINK

Karaoke- AVANTIS - 6pm-10pm EAT & DRINK
DAN

**Thursday** — Mels Way (POINCIANA) 6-10pm
Dinner (Live Music Dancing

✗ Atlantic Ave Delray - Park + Go Stroll (EATING + MUSIC)

(OR) ELKS Lodge (Belvedere) Karaoke (Jimmy) 7pm-11pm Food

**Friday** — VFW Palm Springs 6-10pm - (Karaoke)

BAND @ MOOSE (FOOD) 6:30pm - 10:30 pm (Bowman Street)

Live Music L(Steak or FISH) The Pavillion Grille (Yamato) Boca

**Saturday** — Boynton American Legion 6-11pm

Tom Sawyers (Forest Hill Blvd) 6-9pm Food

Avantis - Dancing (Live Music) Dinner

**Sunday** — Brass Monkey 6pm-10pm

sic "Pavillion Grille (Boca ~ Yamato) Food!

CEAN ONE — Delray (Jimmy Grille)

MES WES
(Poini urn)
OVER →

What She Eats, … Where ~

→ SALTOS — (All Meat cut in Kitchen + No Knives/table

AVANTIS ∴ Salmon (NO SAUCE) Rice + Veggies oe
NY Strip / Salad (grn only w/ Tom) Balsamic      WATER
TOO JAYS — ½ Turkey Sand (Tom + Slaw) CK Soup
Atlantis ∴ Stuffed Mushroom Appetizer      →
CRAB CAKES w/ Salad (green/tom) x2 Zinf
L Vinegrette      [+ WATER w/ lemon

MOOSE (BOWMAN St) ∴ Steak or Grilled Fish
(Zinf) x2 SPRITZER TALL GLASS (Sprite Zero) Slaw (m) ½ Pot   rice ¹ veggies

VFW-PALM SPRINGS ∴ SHE LIKES STEAK
NIGHT! Steak (M) ½ Pot + Salad x2 Zin (June/Pam)
L Vinegrette      water w/ lemon

OCEAN ONE ∴ ⌈ASK FOR
BALSAMIC⌋
WeekDAY ~ SALMON (SALAD NOT DINNER) — Lemon TEA or Zinf
SUNDAY NIGHT ∴ Steak (M) ½ Potato lightly Salted
(Jimmy Cirillo) ★ NO BREAD ★ TEA ★ NO BUTTER →

ELKS (BELVEDERE) ∴ Burger (NO BUN) Tom
SLICE + French Fries (She only eats ½ FF)  x2 TOTAL Zinfandel

TOM SAWYERS (FOREST HILL BLVD) ∴ Zinfandel x2 Total
Chicken Fingers (PIN - NO SAUCE) or Meatloaf (NO gravy)
Cole Slaw (NO MAYO - Vinegar) →

Benny's ON THE BEACH — Lobster Salad
w/ FRUIT + AVOCADO x2 Zinfandel

BROGUES — SALAD (Gr Ch + Tom) x2 Zinf

PALM DINER — Egg Whites, CB Hash, Apple Juice
NO SIDES OR TOAST

MELS WAY:
(Poinciana)
Prime Rib
or Steak → Salad
NO CROUTONS
NO POTATO - Tea / Water
NO WINE

PF CHANGS
+ SEASONS 52
+ BONE FISH
SEA BASS
(Chillean)
MUSSELS
RICE + VEGGIES

SALAD - NO WINE -
WATER W/LEMON

SWEET TOMATO : Lemonade - CK Soup
garbonzo + Kidney bean Salad mix, sunflower seeds
mushrooms, broccoli
carrots, Tomato, raisin, light onion, Beets
Romaine Lettuce
+ Balsamic - DESSERT - Custard (sugar fuel)

BRASS MONKEY :-
Grilled Fish (not Salmon) :
green beans + Swt Pot Fries
X1 Zinf + Water W/Lemon.

GM Delia. Please do not use double diapers for Ginger. It is a big waste. Also there are overnight diapers in the bathroom on the lower shelf. If you don't see it, I'll show you. As far as her makeup goes...I did not use a different foundation, I did put heavier than usual because you don't do her makeup and it had to last for the day and for the holiday night. Also no matter how much foundation she is wearing, it still needs to come off completely. If it's not off completely it dries up her skin and that's not good the following day. Without day cream and night cream she gets dark eyes and bags under her eyes. She's 80. Extra care in certain areas is necessary. She's slowly slowing down. If you wish to speak with me, I'll hang out with you a while later today.
Laureen

Sent from my iPhone

1



**EXHIBIT**

tabbies

This is what Laureen sent Delia.

GM Delia. Please do not use double diapers for Ginger. It is a big waste. Also there are overnight diapers in the bathroom on the lower shelf. If you don't see it, I'll show you. As far as her makeup goes...I did not use a different foundation, I did put heavier than usual because you don't do